# EXHIBIT A

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   3:23-mj- *1204-MCR* |
| | ) | |
| the premises at 1600 Twin Oak Drive West, | ) | |
| Middleburg, Florida 32068, | ) | |
| as further described in Attachment A | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

the premises at 1600 Twin Oak Drive West, Middleburg, Florida 32068, as further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before *May 2, 2023* *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Monte C. Richardson _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *4/19/23 @4:35*          *Monte C. R_____*
                                                    *Judge's signature*

City and state:      Jacksonville, Florida          Monte C. Richardson, U.S. Magistrate Judge
                                                    *Printed name and title*

## ATTACHMENT A

### DESCRIPTION AND PHOTOS OF
### SUBJECT LOCATION TO BE SEARCHED

The premises to be searched (Subject Location) is located at 1600 Twin Oak Drive West, Middleburg, FL 32068 in Clay County, Florida. On the premises is a single-story residence with tan siding and white trim, and a gray/black singled roof. The numbers "1600" are black and affixed horizontally to the white trim at the top right corner of the garage. A black mailbox on a wooden post is located at the front of the premises next to the driveway. The numbers "1600," in the form of black over white stickers are adorned horizontally to the left side of the mailbox form the vantage point of Twin Oak Drive.

Ground Surveillance – View of Subject Location from Twin Oak Drive





Aerial view photo obtained from Clay County, Florida Property Appraiser website



3

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, wireless (cellular) telephones, "smart" phones, electronic tablets, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) related to the transportation, receipt, distribution, possession of, or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or to the transportation, receipt, distribution, possession of, or access with intent to view visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any

visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the transportation, receipt, distribution, possession of, or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises (Subject Location) described above herein, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.    Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

18.    During the execution of the search warrant and the search of the Subject Location described in Attachment A, law enforcement personnel are

5

authorized to 1) press or swipe the fingers (including thumbs) of Sam David Harris

Jr., who is reasonably believed by law enforcement to be a user of the device(s), to

the fingerprint sensor (if one exists) of any Samsung Galaxy smart phone electronic

device(s); 2) hold the device(s) in front of Sam David Harris Jr. and activate the

facial recognition feature, if one exists, of any Samsung Galaxy smart phone

electronic device(s); and/or 3) hold any Samsung Galaxy smart phone electronic

device(s) in front of the face of Sam David Harris Jr., and activate the iris recognition

feature, if one exists, for the purpose of attempting to unlock such device(s) in order

to search for evidentiary items as authorized by this warrant.

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>the premises at 1600 Twin Oak Drive West,<br>Middleburg, Florida 32068,<br>as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:23-mj- 1204-MCR

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

the premises at 1600 Twin Oak Drive West, Middleburg, Florida 32068, as further described in Attachment A,

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 & 2252A | Possession, access with intent to view, transportation, receipt, and distribution of visual depictions of minors engaged in sexually explicit conduct and child pornography |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Benjamin J. Luedke, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/19/23

*Judge's signature*

City and state: Jacksonville, Florida

Monte C. Richardson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Benjamin J. Luedke, being duly sworn, hereby state as follows:

1.     I am a Special Agent (SA) with Homeland Security Investigations (HSI), the investigative arm of Immigration and Customs Enforcement (ICE), formerly known as the United States Customs Service. I have been assigned to the Office of the Assistant Special Agent in Charge, Jacksonville, Florida since August 2007. Prior to that, I was assigned to the Blaine, Washington office, beginning in July of 2002. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I have attended the Basic Criminal Investigator School and the United States Immigration and Customs Enforcement Academy at the Federal Law Enforcement Training Center in Brunswick, Georgia, and I have received training in the area of Customs laws. In my capacity as a Special Agent, I have participated in numerous types of investigations during which I have conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, extradition cases and other complex investigations. Prior to my employment with HSI, I worked as a federal police officer with the U.S. Capitol Police from June 2000 to March 2002. Since becoming a Special Agent, I have worked with experienced Special Agents and state and local law enforcement officers who also investigate child exploitation offenses.

2.     I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), the Clay County Sheriff's Office (CCSO), and the Putnam County Sheriff's Office, among other agencies. These agencies routinely share information involving the characteristics of child sex offenders as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.     This affidavit is based upon my personal knowledge, experience, and training, as well as other information developed during this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, fruits,

2

instrumentalities, other items illegally possessed and evidence of violations of 18

U.S.C. §§ 2252 and/or 2252A, are present in the location to be searched.

4.      I make this affidavit in support of an application for a search warrant

for authority to search the premises located at 1600 Twin Oak Drive West,

Middleburg, FL 32068  (the "Subject Location"), as more particularly described in

Attachment A, which includes several outbuildings, as well as any computer and

computer media and electronic storage devices located therein. I also request

authority to seize any and all items listed in Attachment B as evidence, fruits, and

instrumentalities of criminal activity specified herein. I also request that this Court

authorize law enforcement officers to press the finger(s) (including thumbs) of Sam

David Harris Jr. to any Samsung electronic device's fingerprint sensor (if one exists)

during the search of the premises in an attempt to unlock the device(s) for the

purpose of executing the search authorized by this warrant.

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and

2252A, relating to material involving the sexual exploitation of minors. Based upon

my training and experience, as well as conversations with other experienced law

enforcement officers, computer forensic examiners, and federal prosecutors, I know

the following:

        a.      18 U.S.C. § 2252(a) in pertinent part prohibits a person from

        knowingly transporting, shipping, receiving, distributing, reproducing for

        distribution, possessing or accessing with intent to view any visual depiction of

3

minors engaging in sexually explicit conduct using any means or facility of

interstate or foreign commerce or in or affecting interstate or foreign

commerce, including by computer or mails.

b.      18 U.S.C. § 2252A(a) in pertinent part prohibits a person from

knowingly transporting, shipping, receiving, distributing, reproducing for

distribution, possessing, or accessing with intent to view any child

pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of

interstate or foreign commerce or in or affecting interstate or foreign

commerce, including by computer.

c.      18 U.S.C. § 2252(a)(1) prohibits a person from knowingly

transporting or shipping using any means or facility of interstate or foreign

commerce or in or affecting interstate or foreign commerce, including by

computer or mails, any visual depiction of minors engaging in sexually

explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any

person to knowingly receive or distribute, by any means including by

computer, any visual depiction of minors engaging in sexually explicit conduct

using any means or facility of interstate or foreign commerce or that has been

mailed or shipped or transported in or affecting interstate or foreign

commerce. That section also makes it a federal crime for any person to

knowingly reproduce any visual depiction of minors engaging in sexually

explicit conduct for distribution using any means or facility of interstate or

foreign commerce or in or affecting interstate or foreign commerce or through

4

the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

       d.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography

that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.     The following definitions apply to this Affidavit:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in engaged in sexually explicit conduct or in sexually explicit poses or positions.

b.     "Child pornography," as used herein, includes the definitions in 18 U.S.C. § 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct). *See* 18 U.S.C. §§ 2252 and 2256(2).

6

c.      "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

d.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

e.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including,

7

but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.     The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well

8

as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

    i.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

    j.    The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Based on my training and experience, I know that the Internet and cellular telephones are facilities of interstate commerce.

    k.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet

Service Provider (ISP) may assign a unique and different number to a computer at different times that it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

l.      "Wireless telephone" (or mobile telephone, or cellular telephone, or smart phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

10

m.     A "smart phone" is a portable device that combines mobile telephone and computing functions into one unit. They are distinguished from feature phones (mobile telephone with minimal features) by their stronger hardware capabilities and extensive mobile operating systems, which facilitate wider software, internet (including web browsing over mobile broadband), and multimedia functionality (including music, video, cameras, and gaming), alongside core phone functions such as voice calls and text messaging.

n.     A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

o.     A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital

11

data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## COMPUTERS AND CHILD PORNOGRAPHY

7.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology, and the use of smart phones, have revolutionized the way in which individuals interested in child pornography interact with each other.  In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to develop and reproduce the images.  There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement.  The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.     The development of computers and smart phones, has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband.  Computers and smart phones basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

9.     Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras, as well as smart phones such as the Apple iPhone, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding thousands of images and videos.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

11.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.     Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo!, and Google, as well as cloud-based online storage

services such as Apple's iCloud, Dropbox, and Mega, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.    As is the case with most digital technology, communication by way of computer or smart phone can be saved or stored on the device used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer or smart phone will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child

14

pornography investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer or smart phone user's Internet activities, generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers and smart phones commonly require agents to download or copy information from the computers and smart phones and their components, or seize most or all computer items and smart phones (hardware, software, and related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Computer storage devices (e.g., hard drives, compact disks ("CDs"), diskettes, tapes, and others) can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.

15

This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

    b.    Searching computer systems and smart phones for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system or smart phone, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer and smart phone evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media or smart phones by the user.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.     Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a.     Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.     Many individuals who collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children.

17

c.     Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

d.     Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

e.     Some individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange, or

18

commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f.    Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute child pornography by computer devices using the Internet often maintain and/or possess the items listed in Attachment B.

16.    As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement

19

officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I learned from HSI Special Agent A. Algozzini that he conducted an investigation in 2016 in the Middle District of Florida in which the subject had his residence searched in July 2016 pursuant to a state search warrant and his wireless telephone and computer tablet seized by the Jacksonville Sheriff's Office. The search of these devices revealed the subject knowingly possessed several images of child pornography. The subject retained an attorney, and both were made aware of the ongoing investigation into the subject's commission of child pornography offenses. Approximately two months later, the subject was arrested on federal child pornography charges. On the same day as the subject's arrest, HSI executed a federal search warrant and seized a wireless telephone acquired and used by the subject after the execution of the state search warrant at his residence. Subsequent forensic examination of this wireless telephone revealed that the subject had received, possessed and viewed images of child pornography numerous times on his new device after the execution of the state search warrant and before his federal arrest.

17.     Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and

20

repetitive basis. However, as referenced above, evidence of such activity, including

deleted child pornography, often can be located on these individuals' computers and

digital devices using forensic tools. Furthermore, even in instances in which an

individual engages in a cycle of downloading, viewing, and deleting images, a

selection of favorite images involving a particular child or act is often maintained on

the device.

18.   Based on my training and experience, I know that within the last

several years, individuals who have a sexual interest in minor children have used the

Internet and Internet-enabled devices with increasing frequency to make contact with

and attempt to establish relationships with potential child victims. These individuals

may perceive that the internet provides some degree of anonymity and safety from

prosecution. Because more and more children are using the Internet and Internet

enabled devices, these individuals potentially expose more and more child victims to

online sexual exploitation. These individuals may contact potential child victims

through social networking websites such as Facebook and Twitter or may engage in

online conversations with children through text messaging and email. During these

online conversations, photographic images and links to Internet websites can be

easily exchanged between the individual and the targeted child. Based on my training

and experience, I know that when such an individual uses text messaging, email, or

other websites to have online contact with children, the Internet-enabled device used,

whether it is a computer, a wireless or cellular telephone, a "smart" phone, such as

an "iPhone," or a tablet such as an "iPad," often saves and maintains evidence of

such contacts. This evidence can often be extracted and examined by a trained forensic examiner.

19.     Content on smart phones and other wireless telephones and electronic devices can also be easily transferred with the stroke of a key to other electronic devices or backed up on cloud-based storage devices. I know from my training and experience, that individuals often back-up their digital files on one electronic device to another, and that current technology permits users to read, write and transfer data between devices. I have executed search warrants where multiple electronic devices have been seized and the forensic examination has identified back-up copies of content from wireless telephones on other computer devices seized from the same residence. I have also executed search warrants where child pornography was discovered on multiple devices seized from different rooms of the same residence and purportedly primarily used by different residents within the same home.

## UNLOCKING ELECTRONIC DEVICES
## USING BIOMETRIC FEATURES

20.     I know from my training and experience, as well as publicly available materials, that encryption systems for mobile/smart phones and other electronic devices are becoming ever more widespread. Such encryption systems protect the contents of these devices from unauthorized access by users and render these contents unreadable to anyone who does not have the device's password. As device encryption becomes more commonplace, the encryption systems implemented by

device manufacturers are becoming more robust, with few—if any—workarounds available to law enforcement investigators.

21.     I also know that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

22.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. Examples of such devices providing a fingerprint unlocking capability are several models of Apple's iPhone, as well as several phones, including but not limited to the Samsung Galaxy, which use the Android operating system. Apple iPhones may be fingerprint unlocked using a function called Touch ID, which during setup allows for registering as many as five (5) fingerprints to unlock the device. Samsung's Galaxy S8 and S8+ models may be configured to be unlocked with as many as four (4) fingerprints. In fact, the number of electronic devices providing a fingerprint unlocking capability, including both smart phones and laptops, is growing continually.

23.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During

23

the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based upon the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

24.    If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

25.    Based on my training and experience, I know that users of electronic devices often enable the above-mentioned biometric features because they are considered a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. In some instances, biometric features are considered a more secure way to protect a device's contents.

26.    Related to the above discussion regarding encryption, if a forensic examination is not conducted shortly after seizing the device while it is in an

24

unlocked state or unlocking the device using biometric features immediately upon

seizing it, law enforcement investigators may completely lose the ability to

forensically examine the device, assuming the device's owner refuses to disclose the

password. The passcode or password that would unlock any such device subject to

search under this warrant is not known to law enforcement.  Thus, law enforcement

personnel may not otherwise be able to access the data contained within the device,

making the use of biometric features necessary to the execution of the search

authorized by this warrant.

     27.    Biometric features will not unlock a device in some circumstances even

if such features are enabled. This can occur when a device has been restarted,

inactive, or has not been unlocked for a certain period of time.  For example, Apple

devices cannot be unlocked using Touch ID when: 1) more than 48 hours has

elapsed since the device was last unlocked; or 2) when the device has not been

unlocked using a fingerprint for eight (8) hours and the passcode or password has not

been entered in the last six (6) days. Similarly, certain Android devices cannot be

unlocked with Trusted Face if the device has remained inactive for four (4) hours.

Biometric features from other brands carry similar restrictions.  Thus, in the event

law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may exist

for only a short time.

28.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of these biometric features, the warrant I am applying for would permit law enforcement personnel to: 1) press or swipe the fingers (including thumbs) of Sam David Harris Jr., whom I have probable cause to believe is the user of the device(s), to the fingerprint scanner of the device(s); 2) hold the device(s) in front of the face of Sam David Harris Jr. and activate the facial recognition feature; and/or 3) hold the device(s) in front of the face of Sam David Harris Jr. and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. In the event that law enforcement is unable to unlock the subject device(s) within the number of attempts permitted by the pertinent operating system, this will simply result in the device(s) requiring the entry of a password or passcode before it can be unlocked.

## WEB-HOSTING/WEB-STORAGE COMPANIES

29.     Based on my training and experience, I learned the following about web-hosting companies:

a.     Web-hosting companies, such as Dropbox, Inc., maintain server computers connected to the Internet. Their customers use those computers to operate websites on the Internet.

b.     In general, web-hosting companies like Dropbox, Inc. ask each of their customers to provide certain personal identifying information when registering for an account. This information can include the customer's full name, physical address,

telephone number and other identifiers, email addresses, and business information. Web-hosting companies also may retain records of the length of service (including start date) and types of services utilized. In addition, for paying customers, web hosting companies typically retain information about the customer(s) means and source of payment for services (including any credit card or bank account number).

  c.  Web-hosting companies' customers place files, software code, databases, and other data on the servers. To do this, customers connect from their own computers to the server computers across the Internet. This connection can occur in several ways. In some situations, it is possible for a customer to upload files using a special website interface offered by the web-hosting company. It is frequently also possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the IP addresses of the remote users' computers. Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

  d.  Dropbox, Inc. is a file hosting service headquartered in San Francisco, California, that offers cloud storage, file synchronization, personal cloud, and client

software. Dropbox, Inc. allows users to create a special folder on each of their computers, which Dropbox, Inc. then synchronizes so it appears to be the same folder (with the same contents) regardless of which computer is used to view it. Files placed in this folder also are accessible through a website and mobile phone applications.

e.     Dropbox, Inc. users sign up for an account with a valid e-mail address. Dropbox, Inc. will typically give users a certain amount of free storage, and if the user wants more storage, the user can pay for it. Users can access Dropbox, Inc. from anywhere in the world using the internet. For example, a user can take a photograph from a smartphone and upload that photo to Dropbox, Inc. and erase it from their phone. The photograph now resides in the user's "cloud." The user can then access his/her Dropbox, Inc. account from a desktop computer and download the photograph to that machine.

f.     Another feature of Dropbox, Inc. is sharing. A Dropbox, Inc. user can share certain files he/she designates by sending a web link to another user. It then gives the second user access to those files.

g.     I know that Dropbox, Inc. maintains records on their users, such as basic subscriber information within the meaning of 18 USC 2703(c)(2). Furthermore, I know that Dropbox, Inc. keeps and maintains the stored content of their users account, such as photographs, movies, documents, and music within the meaning of the Stored Communication Act.

## FACTS ESTABLISHING PROBABLE CAUSE

30.    I make this affidavit in support of a search warrant for the Subject

Location that I believe to be currently occupied by Sam David Harris Jr. and

N███ L██ Harris. This affidavit is based upon information provided to me both

verbally and in written documentation from other law enforcement officers and

personnel, to include Clay County Sheriff's Office (CCSO) Sergeant (Sgt.)

Christopher Garrison, as well as through an investigation I have personally

conducted as set forth herein. I have also reviewed documents provided by Sgt.

Garrison. I have personally observed the Subject Location, and it appears as set forth

in Attachment A.

31.    HSI is investigating the use of one or more computers, cellular/smart

phones, and computer media at the Subject Location to commit violations of 18

U.S.C. §§ 2252 and/or 2252A, which prohibit the transportation, receipt,

distribution, possession, and access with intent to view child pornography, that is,

visual depictions of one or more minors engaging in sexually explicit conduct as

defined in 18 U.S.C. § 2256.

32.    During February 2023, I learned from CCSO Sgt. Garrison that the

CCSO Internet Crimes Against Children Unit (ICAC Unit) received CyberTipline,

herein referred to as "Cyber Tip," Report 155603333 from the National Center for

Missing and Exploited Children (NCMEC) in or about February 2023. On or about

February 22, 2023, I received Cyber Tip 155603333 from Sgt. Garrison. Based on my

training and experience, I know that NCMEC receives information from Electronic

Service Providers (ESPs) regarding incidents involving possible child exploitation offenses. When ESP personnel discover that child sexual abuse material (CSAM), that is, child pornography, has been stored and/or transmitted on that ESP's system, they report that information to NCMEC. The ESP submits this report, which generally contains account, log-in information, and other information that may help identify a criminal subject, and uploads content to the NCMEC via a secure connection. Aside from required information, such as incident type, date, and time, reporters can also fill in voluntary reporting fields such as user or account information, IP addresses, or information regarding the uploaded content itself, as well as other information that has been collected in connection with the suspected criminal activity. This information is formatted into a Cyber Tip and assigned a reference number. I have since reviewed Cyber Tip 155603333 in its entirety. Based on my review of Cyber Tip 155603333 and documents provided, I have learned, among other things, the following information:

a. On February 19, 2023, NCMEC received Cyber Tip 155603333, reported by Dropbox, Inc., herein referred to as "Dropbox," advising four suspected CSAM files were uploaded by the reported user. The following information was provided within this Cyber Tipline:

Incident Information

Type: Child Pornography (possession, manufacture, and distribution)

Time: 2/18/2023 09:03:00 UTC

Description of Time: The incident date/time is set to 24 hours before the report was sent from Dropbox to NCMEC.

<u>Suspect</u>

Email Address: duval921@gmail.com (Verified on 11-17-2016)

Screen / Username: Sam Harris

IP Address: 2600:1700:9bf0:1180:78fe:d816:b303:c503 (Login) on 2/6/2023 @ 10:56:26 UTC

<u>Upload File Information</u>

Filename: va_15_ev.mp4

MD5: 0b44179aecf6edc56a64e24c7a6b30f2

Did Reporting ESP view entire contents of uploaded file? Yes

Filename: va_42_ev.mp4

MD5: 2891f3fa6c3973add630ed1476834278

Did Reporting ESP view entire contents of uploaded file? Yes

Filename: va_12_ev.mp4

MD5: 336edfefa002f6e1fe3f99343ee5ab01

Did Reporting ESP view entire contents of uploaded file? Yes

Filename: va_37_ev.mp4

MD5: 97865c1a17583e46da54040153ab8496

Did Reporting ESP view entire contents of uploaded file? Yes

33.     On February 23, 2023, I conducted open-source research on IP address 2600:1700:9bf0:1180:78fe:d816:b303:c503 and discovered it resolves to AT&T Internet in Middleburg, FL.

34.     On February 26, 2023, I issued a summons to AT&T requesting customer information for the subscriber of IP address 2600:1700:9bf0:1180:78fe:d816:b303:c503 on February 6, 2023, @ 10:56:26 UTC. On February 28, 2023, AT&T provided the requested information. The following is a summary:

Billing Party

Account Name: Sam Harris

Address: 1600 Twin Oak Dr W, Middleburg, FL 32068

Account Creation: 2/23/2017

Account Status: Open

Account Email: Samharris0285@Att.Net

Service Information

Name: Sam Harris

Service Address: 1600 Twin Oak Dr W, Mdbg, FL 32068

Contact Phone: (904) ███504

Contact Email: Duval921@Gmail.Com

IP Usage

IP Address Start Date: 8/21/2022 @ 04:11 PM

2600:1700:9bf0:1180::/60

35.     On February 26, 2023, I requested from U.S. Postal Inspector (USPI) Keith Hannon the names of any person receiving mail at the Subject Location. On March 1, 2023, USPI Hannon provided me with information advising that, according to U.S. Postal Service records, N████ Harris, W████ W████, and Sam Harris are the names receiving mail at the Subject Location.

36.     On February 28, 2023, I conducted open-source research and discovered that 904-522-4504 resolves to a Verizon customer. I also conducted an address search using the Subject Location within the Florida Driver and Vehicle and Information Database (DAVID) and discovered that Sam David Harris Jr. (residential and mailing address since 1/29/2020) and N████ I████ Harris (residential and mailing address since 9/30/2020) provided the address of the Subject Location as their residence. In addition, Sam Davis Harris Jr.'s date of birth as provided on his driver's license is 09/21/████. As detailed above, the numbers 921 were reported by Dropbox as part of the suspect email address [duval921@gmail.com] in Cyber Tip 155603333.

37.     On March 2, 2023, I issued a summons to Dropbox requesting account information, to include IP history, for the subscriber of the following since February 18, 2022:

Email Address: duval921@gmail.com (Verified 11-17-2016 00:57:16 UTC)

Screen / Username: Sam Harris

ESP/User ID: 610469395

33

On March 3, 2023, Dropbox provided the requested information. The following is a summary:

Authentication Log

Timestamp: 2/6/2023 @ 10:56:26 UTC

IP Address: 2600:1700:9bf0:1180:78fe:d816:b303:c503

Mobile Information

Last Ping Time/Date: 2/6/2023@ 10:56:47 UTC; 2/19/2023 @ 09:02:31
UTC

IP Address: 2600:1700:9bf0:1180:78fe:d816:b303:c503

IP Address: 2600:1006:b11f:f4f4:3c35:e49:7bbd:5757

Subsequent open-source research conducted by me on March 6, 2023 revealed IP address 2600:1006:b11f:f4f4:3c35:e49:7bbd:5757 resolves to Verizon Wireless.

38.     On March 2, 2023, I issued a summons to Google requesting account information, to include IP history, for the subscriber of duval921@gmail.com. On March 17, 2023, Google provided the requested information. The following is a summary:

Name: Sam Harris

e-Mail: duval921@gmail.com

Created: 3/31/2010

Last Updated: 3/16/2023

Account Recovery

Recovery SMS: +19045224504

34

Numerous IP addresses were recorded by Google between June 20, 2022, and February 24, 2023. On March 21, 2023, I conducted open-source research on the twenty-nine (29) IP addresses recorded in February 2023 and discovered three resolved to AT&T Internet and the remaining resolved to Verizon Wireless.

39.     On March 21, 2023, I issued a summons to Verizon requesting subscriber information for the user of 904-522-4504 to include current and previous devices registered to the user. On March 22, 2023, Verizon provided the requested information. The following is a summary:

Name: N███████Harris

Address: 1600 Twin Oak Dr W, Middleburg, FL 32068

Device: Samsung Galaxy S21 Plus 5G 128GB Black

IMEI: 350264683068074

IMSI: 311480715791176

Device ID: 89148000007462606647

Status: Active since 12/6/2021

I conducted open-source research using the descriptor "Samsung Galaxy S21 Plus" and discovered specifications for the Samsung Galaxy S21 Plus 5G smart phone, which revealed it has an ultrasonic fingerprint sensor and an optical fingerprint sensor.

40.     On March 21, 2023, I issued a summons to AT&T requesting customer information for the subscriber of IP address

35

2600:1700:9bf0:1180:4099:d4fa:5d2a:2cc5 on 2/24/2023 @ 01:52:14,

2600:1700:9bf0:1180:78fe:d816:b303:c503 on 2/15/2023 @ 15:50:55, and

2600:1700:9bf0:1180:8900:d241:86c5:70f3 on 2/1/2023 @ 12:17:04. All three IP

addresses were recorded by Google and provided in the information I received from

Google on March 17, 2023. On the same day, AT&T provided the requested

information. The following is a summary:

Billing Party

Account Name: Sam Harris

Address: 1600 Twin Oak Dr W, Middleburg, FL 32068

Account Creation: 2/23/2017

Account Status: Open

Account Email: Samharris0285@Att.Net

Service Information

Name: Sam Harris

Service Address: 1600 Twin Oak Dr W, Mdbg, FL 32068

Contact Phone: (904) ███ 504

Contact Email: Duval921@Gmail.com

41.    On March 23, 2023, I reviewed the CSAM files associated with Cyber

Tip 155603333. My description of one of the files is as follows:

File Name: va_15_ev.mp4

Description: This file is a color video with sound that is approximately 1:01 in

length. At the onset of the video, what appears to be an adult male's erect

36

penis is penetrating a child's anus. The vantage point of the video is looking down at the child. The child is laying on her back on what appears to be bedding and the male is standing up. The child's legs are spread and her knees are bent. The child is nude except for a bondage style halter top. The following is embossed at the bottom right corner of the screen: "telegram:@komedoge628." In addition, a child-like cartoon lion watermark is visible in the middle of the screen. At the :25 mark, the camera angle changes and gets closer to the child's genital area and then returns to the initial viewpoint a few seconds later. The adult male is using his left hand to hold the child's right leg. At the :40 mark, the camera angle again changes to get closer to the child's genital area and the male ejaculates into the child's anus. The adult male removes his penis from the child's anus and then moves the camera to show a close up of his semen in the child's anus. I believe the female in the video is a prepubescent child based on her child-like facial features, child-like size of her body, lack of breast development, and lack of pubic hair. Based on my training and experience, as well as my review of this video, I have probable cause to believe that this video depicts at least one minor engaged in sexually explicit conduct, that is, genital-genital sexual intercourse, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

## CONCLUSION

42.     Based on the foregoing, I have probable cause to believe that one
or more individuals have used and is using one or more computer devices, smart
phones, and/or electronic storage media at the premises located at 1600 Twin Oak
Drive West, Middleburg, FL 32068, that is, the Subject Location, more fully
described in Attachment A to this affidavit to, among other things, transport, receive,
distribute, possess, and access with intent to view child pornography. Therefore, I
have probable cause to believe that one or more individuals, using the Subject
Location described above, has violated 18 U.S.C. §§ 2252 and/or 2252A.
Additionally, I have probable cause to believe that fruits, evidence, and
instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one
computer device, cellular telephone, and/or other electronic storage media
containing images and/or videos depicting child pornography, and the items more
fully described in Attachment B to this affidavit (which is incorporated by reference
herein), will be located at the Subject Location.

43.     Accordingly, I respectfully request a search warrant be issued by this
Court authorizing the search and seizure of the items listed in Attachment B. I also
request that in such search warrant this Court authorize law enforcement officers to
press the finger(s) (including thumbs) of Sam David Harris Jr. to any Samsung
Galaxy smart phone device's fingerprint sensor (if one exists) and/or present his iris
or face to such device's camera during the search of the Subject Location in an

attempt to unlock the device(s) for the purpose of executing the search authorized by this warrant.

## REQUEST FOR SEALING

44.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because this search warrant is relevant to an ongoing investigation. Based upon my training and experience, I have learned that online criminals sometime actively search for criminal affidavits and search warrants via the internet and disseminate them to other online criminals. Sharing of the information set forth in this affidavit may cause individuals to destroy relevant evidence and/or flee in order to avoid prosecution. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the ongoing investigation and may severely jeopardize its effectiveness.

Benjamin J. Luedke, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this
_____ day of April, 2023, at Jacksonville, Florida.

MONTE C. RICHARDSON
United States Magistrate Judge

39

## ATTACHMENT A

### DESCRIPTION AND PHOTOS OF
### SUBJECT LOCATION TO BE SEARCHED

The premises to be searched (Subject Location) is located at 1600 Twin Oak Drive West, Middleburg, FL 32068 in Clay County, Florida. On the premises is a single-story residence with tan siding and white trim, and a gray/black singled roof. The numbers "1600" are black and affixed horizontally to the white trim at the top right corner of the garage. A black mailbox on a wooden post is located at the front of the premises next to the driveway. The numbers "1600," in the form of black over white stickers are adorned horizontally to the left side of the mailbox form the vantage point of Twin Oak Drive.

Ground Surveillance – View of Subject Location from Twin Oak Drive





Aerial view photo obtained from Clay County, Florida Property Appraiser website



## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, wireless (cellular) telephones, "smart" phones, electronic tablets, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) related to the transportation, receipt, distribution, possession of, or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or to the transportation, receipt, distribution, possession of, or access with intent to view visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any

visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the transportation, receipt, distribution, possession of, or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.      Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

3

electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4

14.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises (Subject Location) described above herein, including rental or lease agreements; mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.     Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

18.     During the execution of the search warrant and the search of the Subject Location described in Attachment A, law enforcement personnel are

5

authorized to 1) press or swipe the fingers (including thumbs) of Sam David Harris Jr., who is reasonably believed by law enforcement to be a user of the device(s), to the fingerprint sensor (if one exists) of any Samsung Galaxy smart phone electronic device(s); 2) hold the device(s) in front of Sam David Harris Jr. and activate the facial recognition feature, if one exists, of any Samsung Galaxy smart phone electronic device(s); and/or 3) hold any Samsung Galaxy smart phone electronic device(s) in front of the face of Sam David Harris Jr., and activate the iris recognition feature, if one exists, for the purpose of attempting to unlock such device(s) in order to search for evidentiary items as authorized by this warrant.

6